**In re RACE HORSES, INC., d/b/a Blue Ribbon Downs, 73–097674, Debtor.**

**Bankruptcy No. 97–70073.**

United States Bankruptcy Court,
E.D. Oklahoma.

March 26, 1997.

Robert Inglish, Okmulgee, OK, for Debtor.

Linda Alexander and Mark Pordos, Oklahoma City, OK for petitioning creditor, Mark Barnes.

### OPINION

TOM R. CORNISH, Bankruptcy Judge.

Mark Barnes, creditor of Race Horses, Inc. d/b/a Blue Ribbon Downs ("BRD"), filed an involuntary Chapter 11 petition on January 14, 1997. BRD was the first horse racing facility in Oklahoma. The petitioning creditor obtained a judgment against BRD for personal injuries in July 1996 for $1.3 million. This case has been appealed. The lien has been filed with the county clerk and is a lien on the property of BRD. The petitioning creditor believed that BRD had less than twelve creditors at the time of filing the petition. Other creditors now desire to join in the petition. BRD seeks dismissal of the petition because it had twelve or more creditors at the time the petition was filed. It also claims the petition was filed in bad faith.

BRD owed the Oklahoma Horse Racing Commission ("OHRC") $219,000 for equine testing and racing officials' compensation for 1996. The payment was due on January 15, 1997 as set forth in the Conditional License for the 1997 racing days. The Conditional License further provided that if the conditions of the license were not met, a fine could be imposed, and the license revoked or suspended. BRD did not have the funds to pay the OHRC, but proposed a plan to collect stall rent from the horsemen, which would be paid to the OHRC. In January and February, rental income was $38,000 and $42,000 respectively from stall rent. However, it does not appear that this payment arrangement has been approved by the OHRC. None of these monies have been paid to the OHRC. Additionally, the Conditional License provided that BRD would maintain a $38,000 balance to cover the amounts due to the OHRC. On the 15th of each month, BRD had to make payments to maintain this balance. The initial payment of $38,000 was made to the OHRC.

BRD has a Contract for Deed with the Sallisaw Municipal Authority ("SMA") on the race track. The quarterly payments due on the Contract for Deed are $73,492.77. The payments were made for the quarters ending March 1996; June 1996 and September 1996. The September 1996 payment was made out of a revolving fund established with the City of Sallisaw. BRD must maintain $100,000 in a revolving fund with the City. However, since the payment was made from the fund, the fund has not been replenished. BRD did not make the December 1996 payment. The outstanding debt on the track owed to SMA is $2.5 million. Dwayne Spears, a real estate

appraiser, testified that the property is worth between $3.8 million and $4.5 million. He could not make a more definite valuation since there had been negative publicity about the bankruptcy at the time he was attempting to value the property.

BRD's balance sheet dated January 31, 1997 reflected accounts payable of $837,322.44. For 1996 year end, the accounts payable were $863,884.59. The accounts payable had been steadily increasing over the past year. The cash on hand at the end of January 1997 was a negative $36,987.01. The cash on hand at the end of 1996 was $31,273.02. Dwayne Burrows, general manager of BRD, testified that at the time the involuntary petition was filed, there had been no collection suits or foreclosure proceedings brought against BRD. Further, BRD was current on its payroll taxes. Payment arrangements had been made with most creditors with older balances. In previous years, BRD had obtained a $200,000 line of credit with a bank; however, BRD had been unable to obtain the line of credit because of the bankruptcy. According to its tax returns, BRD has lost money over the last several years.

Horace Strutchman, majority stockholder of Advanced Office Systems, testified that he was contacted by Linda Alexander, petitioning creditor's counsel, requesting that he join this petition. His company was owed approximately $500.00. At the hearing, Mr. Strutchman requested that he be removed as a petitioning creditor. Thus, his Motion for Joinder will be denied. Roger Runge of Resource Design testified that BRD owed his company $755.00. Ikon/Mirex reached an agreement with BRD and a stipulation will be filed withdrawing its Motion for Joinder. The remaining creditors who seek to join in the petition are as follows with the amount of their claim:

| | |
|---|---|
| Federal Corporation | $ 176.14 |
| Active Years | $ 395.00 |
| Advanced Satellite Communications | $1,459.25 |

The claims, excluding Mark Barnes, Ikon and Advanced Office Systems, amount to $2,785.39.

Mark Barnes testified that he believed BRD only had 12 creditors at the time the petition was filed. Mr. Barnes had access to the race track. He had been to BRD ten or twelve times in the last year. He had been there on race days and on one simulcast day. Mr. Barnes was aware that the track had water and electricity. He was also aware of the concessions including food, soda and beer. Mr. Barnes had been in the office at BRD and was aware that it contained normal office equipment.

Ms. Alexander testified that she conducted an investigation regarding the number of creditors which BRD owed money. Ms. Alexander reviewed the transcript of the asset hearing. The transcript revealed approximately ten potential creditors. She contacted Cookson Hills electrical cooperative and was informed that BRD was current on their account. She had been advised that BRD owed money to a printer; she contacted the only printer in Sallisaw and determined that BRD owed him no money. The beer distributor was also contacted and stated that $2,000 was owed on BRD's account. SISCO, the food distributor, revealed that $3,000 was owed to it but that BRD was not in arrears. This $3,000 had been incurred in the preceding thirty days and therefore, she did not believe that it was a claim. Ms. Alexander was advised that there were no arrearages on the water bill. She was, however, advised that an ad valorem tax bill was due. Ms. Alexander attempted to get that debt verified but was unable to do so. She was aware of a judgment by Elaine Schuster's clients but she knew that it had been superseded by the posting of a bond. Ms. Alexander ran a UCC index and found one filing, other than that of the City of Sallisaw, by IBM. She determined that BRD leased equipment from IBM and the account was current. She reviewed the judgment, mechanics' and materialmen's, and civil indexes and found nothing other than Mark Barnes' judgment. She attempted to contact United Tote, who supplied pari-mutuel betting equipment to the track, and received no response. She conducted her investigation for approximately seven days prior to filing the involuntary petition. Ms. Alexander had a Chart of Accounts, which reflected the various accounts used in BRD's bookkeeping system. Greg Marriot, a certified public accountant, testi-

fied that based upon the income tax returns and financial statements, one should have believed that this business had more than twelve creditors.

An involuntary case is commenced by filing a petition by three or more entities which are the holders of claims that are not contingent or subject of a bona fide dispute, if such claims aggregate at least $10,000 above the collateral securing their claims. 11 U.S.C. § 303(b)(1). If the answer to the involuntary petition filed by fewer than three creditors shows the existence of more than twelve creditors, the debtor is required to file, with the answer, a list of all creditors. Rule 1003(b), Fed.R.Bankr.P. After the case has been filed but before the case is dismissed or order for relief is entered, a creditor, holding an unsecured noncontingent claim, may join in the petition with the same effect as if the creditor were a petitioning creditor. 11 U.S.C. § 303(c).

■ The law requires that the petitioning creditors have unsecured claims of at least $10,000. The Court finds that the property of BRD is valued at $4 million. As a result, Mark Barnes is a fully secured creditor. There are four creditors that still desire to pursue their Motions for Joinder. The claims of those creditors total $2,785.39. This does not meet the requisite amount. Even if all Motions for Joinder were granted, the $10,000 requirement still would not have been met. Thus, the petition must be dismissed.

■ The next issue is whether BRD should be allowed to recover costs, attorney fees, and damages pursuant to § 303(i). Section 303(i) provides:

(I) If the court dismisses a petition under this section other than on consent of all petitioners and the debtor, and if the debtor does not waive the right to judgment under this subsection, the court may grant judgment—

(1) against the petitioners and in favor of the debtor for—

(A) costs; or

(B) a reasonable attorney's fee; or

(2) against any petitioner that filed the petition in bad faith, for—

(A) any damages proximately caused by such filing; or

(B) punitive damages.

Courts are not in agreement in the interpretation of § 303(i). *In re Kearney,* 121 B.R. 642, 644 (Bankr.M.D.Fla.1990). Some courts take the position that the award of costs and attorney fees is mandatory if the involuntary case is dismissed. *Id. (citations omitted).* The preferred view is that the award of costs and attorney fees, even if the case is dismissed, is not mandatory, but is within the discretion of the court. *Id.* at 644–45 *(citations omitted).* The finding of bad faith is not necessary for an award of attorney fees and costs to the prevailing debtor. *Id.* at 645. However, the attorney for the debtor cannot be compensated for attorney fees incurred prior to the commencement of the case. *Id.*

■ BRD also seeks to recover compensatory and punitive damages. In order to recover damages against the petitioning creditor, there must be a "reasonably close causal connection between the conduct and the resulting injury." *Id.* at 644 *(quoting Miller–Schmidt v. Gastech, Inc.* 864 F.2d 1181, 1184 (5th Cir.1989)). An award of damages must be proximately caused by the bad faith filing. *Id.* Bad faith is also a prerequisite for an award of punitive damages. *Id.* at 645. A presumption of good faith in favor of the petitioning creditor exists and the alleged debtor has the burden of proving bad faith. *In re Molen Drilling Co.,* 68 B.R. 840, 843 (Bankr.D.Mont.1987) *(citing United States Fidelity & Guar. Co. v. DJF Realty & Suppliers,* 58 B.R. 1008, 1011 (N.D.N.Y.1986)). The court in *Basin Elec. Power Co-op. v. Midwest Processing Co.,* 769 F.2d 483, 486 (8th Cir.1985) noted:

The three creditor requirement is not a meaningless formality that a creditor may ignore until after filing the involuntary petition. While an involuntary petition may be cured after filing when a single creditor files in good faith believing that the creditor has fewer than twelve creditors, a single creditor may not file an involuntary petition knowing the debtor has twelve or more creditors.

Courts have disagreed on the test to determine good faith by single petitioning creditors. *In re Alta Title Co.,* 55 B.R. 133, 140 (Bankr.D.Utah 1985). The four tests are: (1) the subjective test; (2) the objective test; (3) fraud test; and, (4) the test which imposes a duty analogous to the duty imposed by Rule 11, Fed.R.Civ.P. *Id.* The subjective test looks at the creditor's motivations as well as the creditor's conduct. *Molen* at 843. The objective test looks at whether a reasonable person in the position of the creditor would have initiated the involuntary case. *Id.; In re Crown Sportswear,* 575 F.2d 991, 993–94 (1st Cir.1978); *In re Wavelength,* 61 B.R. 614, 620 (9th Cir. BAP 1986). Some courts have viewed a bad faith claim like fraud and required proof by clear and convincing evidence. *Id.* at 844 (citations omitted). The test imposing a duty analogous to Rule 11 requires investigation of the facts and the law prior to signing and submitting of any pleadings. *Id.; In re Petralex Stainless, Ltd.,* 78 B.R. 738 (Bankr.E.D.Pa.1987).

In *Molen,* the assistant vice-president believed that the debtor had less than twelve creditors. *Id.* at 845. His conclusion was based on the accounts payable ledger that listed six creditors. *Id.* The creditor performed a lien search and determined that the debtor only had ten creditors. *Id.* The creditor did not contact the debtor for an updated list of creditors nor did the creditor telephone "traditional" creditors, i.e. utilities supplying telephone and public services. *Id.* The court held that the creditor's inquiry satisfied the standards for inquiry into the number of creditors. The court in *In re Crown Sportswear,* 575 F.2d 991, 992–93 (1st Cir.1978), found that a cursory investigation wherein the petitioning creditor's counsel had conversations with his client, and talked with a woman in the credit department who told him she had no information as to the number of creditors, did not amount to a bad faith filing of the involuntary petition.

In the instant case, Ms. Alexander had a conversation with Bob Inglish, counsel for the Debtor wherein he stated that other than the lawyers and Mark Barnes, there were only four major creditors. Ms. Alexander reviewed the transcript from the asset hearing. She contacted the electric company, a printer, the beer distributor, food distributor, IBM and performed lien searches. Ms. Alexander and her client believed that the OHRC would not permit BRD to conduct races for the 1997 season if it did not make the $219,000 payment on January 15, 1997. They believed BRD would not be able to make this payment. If the track did not have race days for 1997, then no creditors would have been paid. As a result, Mr. Barnes initiated this involuntary proceeding. This Court does not believe that bad faith exists in connection with the filing of this involuntary petition. Ms. Alexander performed an adequate investigation, which did not reveal more than twelve creditors. This action was sufficient to provide the basis for a good faith filing. Thus, BRD is not entitled to damages or punitive damages. Likewise, since the Court did not find any bad faith in filing the petition or damages arising therefrom, no bond is required pursuant to § 303(e).

IT IS THEREFORE ORDERED that the involuntary petition is **dismissed.**